No. 8964.

## LA COMPAGNIE COMMERCIALE DE TRANSPORTS À VAPEUR FRANÇAIS VS. G MILA & CO.

Where suit is brought upon a contract of affreightment for a part of a ship's load, to be delivered on or about a given day, and the ship's arrival at port is delayed by an accident to her machinery so that the shipper has to employ another vessel, he will be released from his obligation to comply with the contract, unless he has voluntarily continued it, and has waived his right to a release by demanding compliance therewith by the ship.

APPEAL from the Civil District Court for the Parish of Orleans Monroe, J.

*Henry Denis* for Plaintiff and Appellant.

*J. Ward Gurley, Jr.*, for Defendants and Appellees.

The opinion of the Court was delivered by

MANNING, J.   This suit is for the recovery of the difference between the rate on 2500 quarters of grain, agreed upon by the parties, *i. e.*, 6s. 1½d., and the rate obtained from others, 4s. 6d., on the defendants' default, and for two days' demurrage.   The sum claimed is £376 11s. 11d, in our currency $1832 69.

A verbal contract was made in July, 1882, by which the defendants engaged freight-room for 4000 quarters of wheat in plaintiff's steamship. "Dupuy de Lôme," to be delivered when required by the steamer, which was expected here about September 30.   The ship broke her machinery while *en route* from Havre to New York, and went into Queenstown for repairs.   She had not left New York for this port at the time she was due here.   The plaintiff's agents here notified the defendants on October 3, that the steamer " left New York Saturday, and will (we expect) require the 4000 quarters of grain engaged from you next week, probably the last two or three days of it."   On the

same day the defendants replied, "we beg to say that our buyer has compelled us to give him shipment by the "Humbert," after learning that the "Dupuy de Lôme" had met with an accident which detained her so long. We, therefore, will not need the room, and you are at liberty to dispose of it." The plaintiffs' agents rejoined of same date: "We understand from your letter of this date, that you wish us to dispose of the room engaged by you per steamship "Dupuy de Lôme" to Havre, for your account, the accident to this steamer's machinery having necessitated your shipping the grain intended for her by the steamship "Humbert." We shall do our best to get offers for the room, and submit them to you for approval. Naturally your engagement with your buyer can in nowise affect your engagement to supply 32,-000 bushels wheat to our steamer at 6s. 1½d per quarter, delivery to be made as required by the steamer, and in case we should be unable to obtain grain to fill your room, we shall have to look to you to furnish the quantity called for."

On the following day the defendants answer: "You do not quite understand our letter regarding the engagement per "Dupuy de Lôme." We consider ourselves released by her accident and non-arrival."

Had they stopped there, there can be little doubt their position would have been impregnable. They could not be expected or required to hold the grain which the "Dupuy de Lôme" was to take about the thirtieth of September, until such time as she could repair her machinery, and complete her voyage. News of the accident which befel her had reached here at once. The probability was that she could not reach this port at or near the time stipulated, and the defendants were justified in looking for another vessel for their shipment. This is not a grain market. Arrangements for procuring the grain, and provision for its shipment, have to be made in advance. They had been made by the defendants, and the accident to the "Dupuy de Lôme" was of such kind as to put them as prudent business men in quest of another vessel to take their grain which, pursuant to their contract, they had collected here ready for use.

But they did not stop there. Their letter proceeds: "We consider ourselves released by her accident *and non-arrival, but if we are wrong in this view, we have no desire that you should for our account dispose of the room as we will, in this event, order more grain to fill the space. Should you, however, be able to find a shipper without loss to us, we give you liberty to accept."

That was a distinct and unequivocal waiver of the right to terminate their contract with the " Dupuy de Lôme," in consequence of her

delay in arriving. They were under no obligation to wait until the twelfth of October, (the ship was not ready until then), and when they were advised on the third by the ship's agents that she would not be ready to take their grain before the last of the next week, they could lawfully abandon a contract which had been broken by her default. Deshon vs. Fosdick, 1 Woods, 287 ; Lowber vs. Bangs, 2 Wall. 728.

The correspondence went on. The plaintiff replied to the last letter on same day : "We beg to say that we do not consider the delay to the "Dupuy de Lôme" sufficiently serious to warrant your view of the matter, and cannot, therefore, see our way to release you from the engagement. As we cannot replace the grain from the parties on same terms, we ask you to propose some means of ascertaining without delay whether your views or ours are correct. Should we prove correct and it is more convenient to you for us to procure other cargo than grain, we shall be pleased to afford any facility to that end which will not prejudice the steamer's interest."

This was on the fourth. To this letter the defendants made no reply whatever. The plaintiff was justified, therefore, in believing that they acquiesced in his view, and did not desire that their room should be disposed of, but would order grain to fill the space.

A week passed, and on the eleventh the ship's agents notified the defendants that she would be ready to take in the grain the next morning, and again on same day that she would have a clear side for an elevator at noon. They were silent. On the twelfth they were notified that the grain was required at once, which notification was repeated later in the day, and on the thirteenth complaint was made that no answers were received and no grain was sent. "We, therefore, beg to notify you herewith, reads the letter, that we shall at once proceed to secure the necessary amount of heavy cargo for the steamer on the best terms that can be obtained for immediate delivery, and we shall hold you responsible for all the loss of whatever nature that may be incurred by the steamer through your failure to fulfill your engagement."

This extorted notice, and the answer was made on same day, an answer which is simply amazing when read by the light of the defense set up on the trial. It reads :

"On our engagement with the steamship "Dupuy de Lôme," we have now in elevator part of same, and we request you to send the steamer alongside to receive them," to which the plaintiff replied that the want of dead weight in the steamer prevented moving her to the elevator, and that it was no part of the engagement to do so. On the fourteenth

the agents inform the defendants that in consequence of their failure to furnish the grain, they have been obliged to engage from Eugster & Co about 20,000 bushels at 4s. 6d. per quarter, and will secure more if they can, but notify them that the agents hold them responsible, and shall expect to collect from them the difference of freight, and the regular compensation for delay to the steamer. And to this the defendants reply, that the engagement with Eugster & Co. cannot possibly concern them, and they will pay no such claims, for that the steamer is large and has capacity to take both. Then follows a recapitulation of the occurrences, more it should seem for the purpose of showing that they had been very considerate and non-exacting than anything else, and concluding with a last and final assertion of the present existence and binding force of their contract: "As soon as our grain arrives we shall expect the steamer to receive it, regardless of your ballast engagement with Eugster & Co."

There can be but one conclusion from this. The defendants hold the plaintiff to the contract to the last moment, and then broke it themselves. They are liable for its violation.

We do not feel the same certainty of conviction, however, touching the claim for demurrage, which the captain of the ship testifies was for two days. It is contended on the part of the defendants that demurrage cannot be claimed except where there is a charter party and express stipulation therefor, and that demurrage for the whole ship is not allowable for the delay in furnishing cargo for a part. One of the witnesses says it is not the custom of this port to charge demurrage in the latter case. Without entering upon the consideration of these defenses, it is sufficient to say we do not think demurrage should be allowed under the circumstances of this case, which have already been detailed. Therefore,

It is ordered and decreed that the judgment of the lower court is avoided and reversed, and that there be judgment now in favor of the plaintiff for nine hundred and seventy-one dollars and twenty-nine cents with five per cent interest from judicial demand, and for costs in both courts.

Rehearing refused.